**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **FIORILLI CONSTRUCTION COMPANY, INC.,** ) | **CASE NO.  1:26-CV-00426** |
| ) | |
| **Plaintiff,** ) | **JUDGE DONALD C. NUGENT** |
| ) | |
| **v.** ) | **FINDINGS OF FACT AND** |
| ) | **CONCLUSIONS OF LAW DENYING** |
| **JEFF KARLOVEC, et al.,** ) | **PLAINTIFF'S MOTION FOR** |
| ) | **TEMPORARY RESTRAINING ORDER** |
| **Defendant.** ) | **AND PRELIMINARY INJUNCTION** |

This matter is now before the Court on Plaintiff Fiorilli Construction Company, Inc.'s ("Fiorilli Construction") *Motion for Temporary Restraining Order and Preliminary Injunction* (ECF #3), in connection with their *Verified Complaint for Temporary Restraining Order, Injunctive Relief, and Damages* (ECF #1) ("*Verified Complaint*"). Fiorilli Construction's motion seeks to prevent Defendant Jeff Karlovec ("Karlovec"), who had left employment at Fiorilli Construction in February 2026, from commencing employment with Welty Building Construction ("*Welty Construction*"),[1] based on Karlovec's alleged breach of a "Confidentiality and Non-Solicitation Agreement" Karlovec had signed upon the commencement of his employment with Fiorilli Construction in November 2016. (ECF #1, *Verified Complaint*, ¶ 16).

---

[1] Welty Construction is not named as a Defendant in the *Verified Complaint*.

# I. **PRELIMINARY MATTERS**

The procedural facts of this litigation (so far) is as follows:

On February 20, 2026, Fiorilli Construction filed its *Verified Complaint* against Karlovec (as well as ten "John Doe" Defendants) alleging that Karlovec had violated of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. (Count I), and the Ohio Uniform Trade Secrets Act, Ohio Revised Code § 1333.61, *et seq*. (Count II), and asserting Ohio common law claims of "Breach of Confidentiality Covenant" (Count III), "Breach of Contract as to Non-Competition" (Count IV), "Breach of Contract as to Company Property" (Count V "First"), "Breach of Common Law Duty of Loyalty" (Count V "Second"),[2] and a final claim against both Defendant Karlovec and the ten "John Doe" Defendants based on a common law claim of "Conspiracy" (Count VI). (ECF #1). On that same date, along with the *Verified Complaint*, Fiorilli Construction filed a *Motion for Temporary Restraining Order and Preliminary Injunction* (ECF #3).

On the same day as Fiorilli Construction's filings, the Court set a Status Conference for February 24, 2026 (the following Tuesday after the Friday filing of Plaintiff's papers), at 9:30 am to plan for a hearing on Plaintiff's motion. (Non-Document Docket Entry following ECF #6). On February 23, 2026, Defendant Jeff Karlovec filed an Affidavit attaching various documents pertinent to Plaintiff's motion (ECF #9), along with a *Brief in Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction*. (ECF #10).

The following day, after completion of the Status Conference, the Court issued a *Minutes of Proceedings*, stating: "*Telephonic Conference held on [Plaintiff's] application for*

---

[2] The *Verified Complaint* identifies two claims as "Count V." As this has no effect on the immediate matters before the Court, the duplicate "Count V" recitations are simply noted as "First" and "Second," but not corrected.

*[temporary restraining order]. Counsel working on potential resolution. Case continued for telephone status 3/2/26 @ 8:30 am.*" (ECF #11).  As the parties were not successful in resolving the matter by the March 2 status conference, the Court set a hearing date of March 9, 2026 to consider Plaintiff's motion in open court. (ECF #12).

At the hearing, the Court heard testimony from:  (1) Defendant Karlovec (first, "as if on cross examination" in Plaintiff/Movant Fiorilli Construction's case, under FED. R. EVID. 611(c)(2), then later as part of Defendant Karlovec's presentation) (ECF #16, *Transcript of 3/9/2026 TRO/Preliminary Injunction Hearing*, pp. 13-26, 152-198); (2) Carmen Fiorilli (the owner of Fiorilli Construction) (ECF #16, pp. 27-64); (3) Alan Longstreth (the "CRO," or Chief Revenue Officer, and "Integrator" at Fiorilli Construction, who signed the letter first accusing Karlovec of breaching his "Confidentiality and Non-Solicitation Agreement") (ECF #16, pp. 65-76); (4) Paul Becks (the President of Welty Construction, where Karlovec is now employed) (ECF #16, pp. 79-116); and Caleb Reynolds (a Senior Analyst and Operations Section Chief at "Interhack Corporation," a forensic computing and cybersecurity consulting firm, who Karlovec had retained to examine his Fiorilli Construction related and personal devices to "preserve the devices and accounts available and search those sources for known Fiorilli information" and to thereafter "remediate [the devices] through deletion," while still preserving copies of the hard drive information of the devices as tendered in a manner inaccessible to Karlovec, but consistent with litigation document preservation and retention obligations) (ECF #16, pp. 116-151).[3]

---

[3]

The Exhibits tendered at the March 9 Hearing (Plaintiff Fiorilli Construction's exhibits were marked numerically, and Defendant Karlovec's exhibits were marked alphabetically) were: ***Exhibit 1*** (*Fiorilli Construction Company, Inc. Confidentiality and Non-Solicitation Agreement*, also marked as "Exhibit B"); ***Exhibit 2*** (Document with the heading "Exhibit D," describing Karlovec's Job Title of "Director of Development, Welty Select" and a list of Job Descriptions

Based on the evidence and legal arguments before it (from the pleadings and affidavits, the motion briefing, the hearing arguments and exhibits presented), and considering the post-hearing *Proposed Findings of Fact and Conclusions of Law* submitted by both parties, the Court makes the following findings of fact and conclusions of law, and hereby rules that Plaintiff Fiorilli Construction's *Motion for Temporary Restraining Order and Preliminary Injunction* (ECF #3) is **DENIED**, and because (as will be stated more fully below) Plaintiff's asserted grounds for seeking a temporary restraining order and preliminary injunction were based on Fiorilli Construction's rather plain "embellishment" of the **actual terms** of the *Fiorilli Construction Company, Inc. Confidentiality and Non-Solicitation Agreement* entered into between Fiorilli Construction and Karlovec, thus leading to unsupportable grounds to establish any right to a temporary restraining order or preliminary injunction, Plaintiff Fiorilli Construction's request for an "interim award of reasonable attorneys fees and expenses" in pursuing their motion for injunctive relief, under paragraph 5 of the Agreement, is also **DENIED**.

As explained more fully below, these rulings are not meant to indicate that Plaintiff's

---

to be included in the role); *Exhibit 5* (Screen-shots from the Welty Construction "Welty Select" website pages); *Exhibit 6* (Screen-shot from Fiorilli Construction's "HubSpot.com" program application showing download of an "All Contacts" file by Karlovec on January 26, 2026); *Exhibit 7* (Print-out of a "Dropbox" folder titled "Ed Paradise Folder/Reports 1-11-18" from Karlovec's Dropbox account); *"Exhibit 9"* (withdrawn as exhibit, but used to "refresh recollection" under Fed. R. Evid. 612(a)); *Exhibit A* (Copy of the *Verified Complaint*); *Exhibit B* (*Fiorilli Construction Company, Inc. Confidentiality and Non-Solicitation Agreement*, also marked as "Exhibit 1"); *Exhibit D* (February 10, 2026 Letter from Alan Longstreth to Jeff Karlovec); and *Exhibit G* (Declaration of Caleb Reynolds, with attached curriculum vitae, "Report of At-Issue (Contacts) File," and "Review and Remediation Report"). At the Hearing, there was no "Exhibit 3," "Exhibit 4," or "Exhibit 8" offered by Plaintiff (and "Exhibit 9" was withdrawn after being marked); and there was no "Exhibit C," "Exhibit E," or "Exhibit F" offered by Defendant.

filing of its *Verified Complaint* generally is wholly without any factual basis whatsoever, as Defendant Karlovec did sign a document titled "*Fiorilli Construction Company, Inc. Confidentiality and Non-Solicitation Agreement*," and that document did describe some limitations on Karlovec's future employment activity after leaving his employment at Fiorilli Construction, but Plaintiff's seeking of an injunction based on terms that did not *actually exist* in the Agreement – such that Defendant Karlovec be prohibited from "directly or indirectly selling, offering to sell, ***or participating in the sale of [apparently <u>any</u>] commercial construction services within a 180-mile radius of Medina, Ohio***," when *neither* of these terms actually appear in Paragraph 4(d) of the Agreement (the only provision at issue in connection with the facts presented to the Court),[4] is simply a "bridge too far" in connection with a legitimate request for injunctive relief.

Plaintiff now asks the Court to judicially *rewrite* the *Fiorilli Construction Company, Inc. Confidentiality and Non-Solicitation Agreement* to **add** a "180 mile radius" provision to what is an otherwise potentially-unenforceable "worldwide" geographic provision, along with **adding** a provision to prevent Defendant Karlovec from engaging in employment related to the sale of ***any*** "commercial construction services" (regardless of whether the services relate to services offered by Fiorilli Construction), pursuant to the holding of *Raimonde v. Van Vlerah*, 42 Ohio St. 2d 21 (1975), *syllabus* ¶ 1,[5] the relief it requests asks too much. It *might* be reasonable to ask this Court

---

[4]
     See ECF #17, *Plaintiff's Proposed Findings of Fact and Conclusions of Law Including Proposed Judgment Entry for Preliminary Injunction*, p. 13) (emphasis and explanatory inserts supplied). The specific terms of Paragraph 4(d) are discussed fully in the text found later in this *Findings of Fact and Conclusions of Law*.

[5]
     As stated in *Raimonde*, "A covenant not to compete which imposes unreasonable

-5-

to amend the potential "worldwide" radius of paragraph 4(d) of the Agreement to *lower* its scope by grafting onto paragraph 4(d) the geographic range presently applicable to only paragraph 4(e) of the Agreement (preventing Karlovec from having an *ownership* interest in a business that offers "commercial general contracting services that are similar to or the same as Fiorilli Construction"), as the Supreme Court of Ohio permitted in *Raimonde* (reducing the scope of a non-compete agreement between veterinary service providers from 30 miles to 18 miles, when one of the veterinarians left the employ of the other); it is quite another matter to ask this Court to amend the Agreement to *expand* Paragraph 4(d) to prohibit Karlovec from engaging in *any* employment related to the sale of *any* "commercial construction services" – regardless of whether such services relate to services offered by Fiorilli Construction – when no such provision exists in Paragraph 4(d).

There may be an understanding that needs to be reached between Fiorilli Construction and Karlovec related to the appropriate restrictions and *actual* coverage of Paragraph 4(d) of the Agreement (related to whether Paragraph 4(d) might prevent Karlovec from selling "smaller" construction services – the type of services "offered by [Fiorilli Construction]" to *existing* Welty Construction clients), though the evidence to date shows that Karlovec has not solicited *any* existing or reasonably identifiable "potential" Fiorilli Construction client for such services, and has also undertaken considerable efforts to divest himself of any Fiorilli Construction information.  These are matters that can be addressed in the normal course and context of this

_____

restrictions upon an employee will be enforced to the extent necessary to protect an employer's legitimate interests."  But, as discussed more fully below, Fiorilli Construction has not produced any evidence that Karlovec has actually violated any provision of the *existing* terms of the Agreement, thus not creating any imminent need for injunctive action to protect his former employer's legitimate business interests.

-6-

litigation. But there exists no present basis or need for this Court to order emergency relief based on a reading of the *Fiorilli Construction Company, Inc. Confidentiality and Non-Solicitation Agreement* that does not comport with the *actual terms* of the Agreement, and which would impose conditions greater than those specified.

The Court now turns to its *Findings of Fact and Conclusions of Law* supporting its rulings.

## II. FINDINGS OF FACT

### A. The Commercial Construction Industry Generally

1. The "commercial construction industry" is very large, and represents a large portion of the U.S. "GDP" (Gross Domestic Product), approximately 5% as estimated by witness Paul Becks, President of Welty Construction. (ECF #16, *Transcript*, p. 81:1-10 [Becks]).[6] There are numerous construction companies in northeast Ohio, many of which do not compete on the same projects or within the same target market segment. (ECF #16, pp 80:24-81:18, 91:6-22 [Becks]).

2. It is not unusual for two commercial construction companies operating within the same region to never compete, based on each working within different market segments, having a different client base, and the various project types based on scope of activity. (ECF #16, p. 81:11-18 [Becks]; p. 153:15-22 [Karlovec]).

3. While Fiorilli Construction (Karlovec's former employer) and Welty Construction (Karlovec's current employer) both work within the same "field," generally called "commercial construction," their traditional target markets and project sizes are significantly different. As

---

[6] The references to the Transcript indicate, first, the page number, followed by a colon symbol and the line numbers on the cited page.

-7-

Carmen Fiorilli (owner of Fiorilli Construction) stated, Welty Construction's general target work is different from Fiorilli Construction's in that Welty Construction works "on much larger scale projects than Fiorilli [Construction]" while Fiorilli Construction's projects range from $5 million to $30 million.  (ECF #16, pp. 29:24-30:6 [Fiorilli]).  The President of Welty Construction, Paul Becks, likewise testified that he does not consider Fiorilli Construction to be a competitor of Welty Construction because, to date, Fiorilli Construction and Welty Construction have never competed on a project.  (ECF #16, pp. 81:24-82:6 [Becks]).  In his 17 years with Welty Construction, Becks was unaware of any instance in which the two companies competed.  (ECF #16, pp. 81:24-82:6 [Becks]).

4.  The subject of the dispute raised by Fiorilli Construction is its belief that "Welty Select," a newly-formed division of Welty Construction, focusing on "small projects," constitutes an intention by Welty Construction to compete with Fiorilli Construction, through the services of Jeff Karlovec, for the same types of construction project services offered by Fiorilli Construction.  (ECF #16, p. 30:7-10, 19-20) ("But I . . . understand that they've [Welty Construction] opened up a new division called Welty Select, which I believe is . . . the type of work that Fiorilli does[.] . . . It actually looks like they're gearing up to do exactly what we do."). Welty Construction, per its President, Paul Becks, testified to his disagreement with this contention, and indicated that the intention of Welty Select was not to "compete" with Fiorilli Construction, but rather to "deepen [its] relationships" with existing Welty Construction clients by being able to "service [its clients] at all levels of the project spectrum providing construction management services," including "smaller-scale projects" being considered by Welty Construction's own clients.  (ECF #16, p. 81:24-25-82:1-17 [Becks]).

-8-

5. These differing views were reflected in the hearing testimony regarding a representation appearing on the Welty Construction website relating to Welty Select, which states: "Welty Construction offers construction management services for small projects through its Welty Select division.  Welty Select provides the expertise, values and vision of a large construction services company for smaller-scale projects.  It's ideal for clients with multiple smaller builds per year." (Hearing Exh. 5, related to ECF #16).  The following excerpts of that testimony highlight this difference.

**_From Carmen Fiorilli_:**

> [COUNSEL FOR FIORILLI CONTRUCTION]:  Well, I believe you have Exhibit 5 in front of you.  Does that appear to be a true and accurate copy of a printout from Welty Select --
>
> [CARMEN FIORILLI]:  Yes.
>
> [COUNSEL]:  – web page?
>
> [FIORILLI]:  Yes.
>
> [COUNSEL]:  All right.  Can you tell  me how that description differs from the business of Fiorilli Construction?
>
> [FIORILLI]:  It actually looks like they're gearing up to do exactly what we do.

(ECF #16, p. 30:11-20 [Fiorilli]).

**_From Jeff Karlovec and Welty Construction_:**

*Karlovec*:

> [COUNSEL FOR FIORILLI CONSTRUCTION]:  Mr. Karlovec, you have Exhibit 5?
>
> [JEFF KARLOVEC]:  Yes.
>
> [COUNSEL]:  All right.  And does that appear to be a true and accurate

printout of a portion of the Welty website?

[KARLOVEC]: It appears to be. I haven't seen it, but . . .

[COUNSEL]: And can you tell me what's the difference between Welty Select's work descriptions and what you did with Fiorilli?

[KARLOVEC]: Well, with Welty Select, focusing on smaller-scale projects, which are similar to what Fiorilli does. But with Welty, my focus is going to be with their current client base, expanding within the current client base and not competing against Fiorilli.

(ECF #16, pp. 20:16-21:4)

*Welty Construction*:

[COUNSEL FOR JEFF KARLOVEC]: You heard testimony today from Mr. Fiorilli that Welty Select is a competitor of Fiorilli's. What would you say to that?

[PAUL BECKS]: I disagree. And our intention was not to create a competition for Fiorilli in any way. The goal of Welty Select and us starting that group within our construction business was to deepen our relationships with existing clients. You know, we do large projects for some clients and our goal was to expend that relationship within those clients and service them at all levels of the project spectrum providing construction management services.

[COUNSEL]: Did Welty recently hire Jeff Karlovec?

[BECKS]: Yeah, we did. . . . We hired Jeff because we wanted to have somebody that would have integrity, and respect our clients, and deepen their relationships within those clients. And so we hired Jeff to help us do that within our client base on the small project side. * * * [W]e understood that Jeff could not sell to Fiorilli's clients. And that wasn't an issue because we had hired Jeff to sell – to develop business further with our clients. So that was the general nature of when we what we understood.

(ECF #16, pp. 82:7-84:2 [Becks]).

### B. **Karlovec's Background in Business Development and Construction**

6. Jeff Karlovec has worked in business development within or around the construction industry since 2002. (ECF #16, p. 152:16-17 [Karlovec]). Prior to his employment with Fiorilli Construction, Karlovec worked in business development roles at Cedrawoods Companies and Tri-C Construction, and also held business development positions with the architectural firm ADA Architects and the contractor Variety Contractors. (ECF #16, pp. 152:18-153:11 [Karlovec]). While working in business development prior to working for Fiorilli Construction, Karlovec developed industry contacts with various area architects, engineers, brokers, and other participants in the commercial construction industry. (ECF #16, pp. 22:17-23:3; 152:5-25-153:1-14; 179:9-11 [Karlovec]).

7. Customers in the commercial construction industry are identified in a variety of different ways, such as public searches of websites, purchased lists (*e.g.*, the Dodge Report), consulting services, subscription services, review of publicly available bid documents, dedicated marketing departments, and the general industry knowledge of experienced business development personnel (such as Karlovec). (ECF #16, pp. 21:5-9; 152:16-17 [Karlovec]).

8. In his prior business development roles, and his role with Fiorilli Construction, Karlovec used the same skills and experience to develop client opportunities by, among other things, cold calling, identifying potential clients, and networking. (ECF #16, pp. 155:15-156:3 [Karlovec]). These skills were the same skills that Karlovec developed from his prior career in business development in the construction industry, and prior to that, in other fields since the 1990s. (ECF #16, pp. 156-19-157:1 [Karlovec]).

C. **Fiorilli Construction's Business and Employment of Karlovec**

9. According to Fiorilli Construction owner Carmen Fiorilli, Fiorilli Construction was founded in 2001and provides commercial general contracting services for retail, "C-stores" (convenience stores), gas stations, self-storage, quick serve, light industrial, medical and outpatient facilities, and multifamily housing. (ECF #16, pp. 27:10-17 & 31:13-23 [Fiorilli]).

10. Fiorilli Construction hired Karlovec as Manager of Business Development in November 2016. (ECF #16, p. 154:12-15 [Karlovec]). He subsequently became the Director of Client Relations, a role in which he remained until he submitted his resignation notice to Fiorilli Construction on February 4, 2026. His letter of resignation indicated an "effective date" of February 18, 2026 (two weeks later):

> I am writing to inform you of my decision to resign from my position as Director of Client Relations at Fiorilli Construction effective February 18th in accordance with the notice period outlined in my employment agreement.
>
> * * * * *
>
> I am committed to ensuring a smooth transition during my remaining time with the company. Please let me know how I can assist in the handover process.

(ECF #16, p. 13:17-20 [Karlovec]; Hearing Exh. C). In his role with Fiorilli Construction, Karlovec focused on construction projects for C-stores, gas stations, quick-serve restaurants, other restaurants, retail offices, commercial, institutional, and multi-family housing. (ECF #16, pp. 31:13-32:4 [Karlovec]).

11. On February 10, 2026, Fiorilli Construction tendered to Karlovec a letter from Alan Longstreth, Fiorilli Construction's Integrator & Director of Client Services, terminating Karlovec's employment with Fiorilli Construction, and stating the following:

-12-

This letter serves as formal notice of breach of the Confidentiality & Non-Solicitation Agreement you executed on November 14, 2016 (the "Agreement") with Fiorilli Construction Company, Inc. ("FCI").

FCI has learned that you have accepted employment with Welty Building Company, including its Special Products Division or other know [*sic*] alias. This employment constitutes a direct violation including but not limited to Section 4(d) of the Agreement, which expressly prohibits you, for eighteen (18) months following termination, from "Selling or offering to sell services which are offered for sale by the Company" *within a 180-mile radius of Medina, Ohio*.

(Hearing Exh. D) (emphasis supplied)

12. With respect to the Agreement referenced in the previous paragraph, the document at issue is a one-page agreement Karlovec signed upon his hire with Fiorilli Construction, titled "Fiorilli Construction Company, Inc. Confidentiality and Non-Solicitation Agreement." Although Fiorilli Construction witness Alan Longstreth testified at the Hearing that "there is a larger agreement that every employee has outside of this agreement . . . ," (ECF #16, pp. 75:24-76:2 [Longstreth]), there was no evidence identified of any other agreement signed by Karlovec and Fiorilli Construction, as Carmen Fiorilli acknowledged at the Hearing. (ECF #16, p. 53:17-22 [Fiorilli]) [7]

**D. Karlovec's Agreement with Fiorilli Construction**

13. Paragraph 3 of the "Fiorilli Construction Company, Inc. Confidentiality and Non-Solicitation Agreement" states:

I agree to hold in strict confidence any and all confidential Company

---

[7]

Plaintiff's *Verified Complaint* and later filings reference a "Confidentiality, Non-Solicitation *& Non-Circumvention Agreement*," (*see, e.g.*, ECF #1, ¶¶ 6, 16) (emphasis supplied); though the evidence presented in these papers confirms that the only agreement between Karlovec and Fiorilli Construction is the one referenced here, as introduced as Exh 1 and Exh. B at the Hearing.

information.  Unless the Company agrees in writing, I will not disclose any confidential information to any entity or persons who are not current employees of the Company, and I will use such information only in connection with my duties as an employee of the Company.  My obligation not go disclose confidential information is a condition of my employment by the Company and continues even after I leave the employ of the Company, in perpetuity.  I also agree and understand that all of the confidential information to which I have access during my employment with the Company belongs to the Company and I shall not remove, convert, utilize, copy, electronically or otherwise, any such information except for use in furtherance of the Company's business.  Upon termination of my employment I shall return to the Company any and all confidential Company information in my possession and control, and shall retrieve and return to the Company any such information sent to or given to anyone other than a customer authorized to possess such information.

(Hearing Exh. 1; Hearing Exh. B).[8]

14.  Paragraph 4 of the Agreement states:

While employed by the Company and for eighteen (18) months after my employment is terminated, I will not directly or indirectly:

a)  Divert or attempt to divert accounts or customers to a competitor;

b)  Employ or seek to employ in any other business anyone curently employed by the Company or employed by the Company in the twelve (12) months prior to the end of my emploment with the Company;

c)  Cause or encourage any employee of the Company to leave their employment, other than in the normal course of my duties with the Company;

d)  *Sell, or offer to sell, services which are offered for sale by the Company*;

e)  Directly or indirectly own or have any Ownership interest in any business that offers commercial general contracting services that are similar to or the same as Fiorilli Construction, Inc.[,] which does business or is located within a one hundred eighty (180) mile radius of Medina,

---

[8] As earlier noted, Plaintiff's Hearing Exhibit 1 and Defendant's Hearing Exhibit B are the same document.  (*See supra*, note 3).

Ohio;

f) Solicit, attempt to solicit, or assist others in soliciting the business of any current, past, or prospective account/customer of the Company. For purposes of this Agreement, past account/customer shall include all accounts/customers of the Company whose last project was completed within the last three years of the time my employment ends, and prospective account/customer shall include all those prospective accounts/customers in which the Company has invested its resources for the purpose of developing business through sales, marketing and/or bidding efforts within the past eighteen (18) months of the time my employment ends;

g) Accept employment as an employee or independent contractor or have any affiliation with any of the Company's current, past, or prospective accounts/customers as defined in Paragraph 3(f) [*sic*][9] above.

(Hearing Exh. 1; Hearing Exh. B) (emphasis supplied).

15. The Agreement is governed by Ohio law and contains a provision (Paragraph 5) that states:

I am aware that my violation of this Agreement will cause the Company irreparable harm. Therefore, I agree that the Company shall be entitled to an injunction preventing me from violating this Agreement and I agree to pay the Company all the costs, including but not limited to attorneys' fees, it incurs in enforcing the terms of this Agreement.

(Hearing Exh. 1; Hearing Exh. B, ¶ 5).

16. Notably, there is no language in the Agreement that prohibits Karlovec from "directly or indirectly selling, offering to sell *or participating in the sale of commercial construction services within a 180-mile radius of Medina, Ohio*," which is the restriction Fiorilli Construction asks this Court to impose (*see* ECF #17, *Plaintiff's Proposed Judgment Entry for*

_____

[9] The reference to "Paragraph 3(f)" is a typographical error. (ECF #16, p. 51:20-21 [Fiorilli]). The context indicates that it should read "Paragraph 4(f)."

-15-

*Preliminary Injunction*, p. 16, ¶ B).[10]  In fact, at the Hearing, Carmen Fiorilli admitted that the Agreement does not contain the word or term "non-competition," and there is no language in the Agreement that prohibits Karlovec from working for a competitor within a 180-mile radius of Medina, Ohio, as indicated by the following testimony:

> [COUNSEL FOR KARLOVEC]:  Anywhere in this Agreement that's marked Exhibit B, is there any language that says Jeff [Karlovec] is prohibited from working for a competitor within a 180-mile radius of Medina, Ohio?
>
> [CARMEN FIORILLI]:  No.
>
> [COUNSEL]:  And in Exhibit B, paragraph 4, or anywhere else in the agreement, is there anything that says Jeff is is prohibited from engaging in commercial construction services within a 180-mile radius of Medina, Ohio?
>
> [FIORILLI]:  No.
>
> [COUNSEL]:  What was that?  I'm sorry?
>
> [FIORILLI]:  No.
>
> [COUNSEL]:  Okay.  And, in fact, the only reference to 180-mile radius involves a restriction under which Jeff cannot own or have an ownership interest in a company that offers commercial general contracting services; isn't that correct?
>
> [FIORILLI]:  Yes.
>
> [COUNSEL]:  Okay.  Didn't Jeff volunteer to you that he was going to work for Welty?
>
> [FIORILLI]:  He did.
>
> [COUNSEL]:  You were the one to verify the complaint that was filed in this case; is that correct?

---

[10]    In effect, this is the injunction Fiorilli Construction asks this Court to enter, despite the lack of direct supporting language drawn from the Agreement.

[FIORILLI]:  Correct.

[COUNSEL]:  I'm going to turn your attention to Exhibit A.[11]

[FIORILLI]:  Okay.

[COUNSEL]:  On page 11 of Exhibit A, is that your signature?

[FIORILLI]:  Yes.

[COUNSEL]:  And in this complaint, you indicate that you're verifying that the – under penalties of perjury that the foregoing facts are true and accurate to the best of my knowledge and belief; is that correct?

[FIORILLI]:  Yes.

[COUNSEL]:  Okay.  And if you turn your attention to paragraph 16 of the complaint on page 3.  You verified to the Court that on November 14th, 2016, Mr. Karlovec signed a confidentiality, nonsolicitation, and noncircumvention agreement; is that correct?

[FIORILLI]:  Yes.

[COUNSEL]:  And when you go to Exhibit B, which is the agreement that Mr. Karlovec signed, is there any reference to a noncircumvention agreement?

[FIORILLI]:  No. No.

[COUNSEL]:  Okay.  And, actually, if you look at Exhibit B, does it contain the words "noncompetition" anywhere?

[FIORILLI]:  No.

[COUNSEL]:  And this is the only agreement that Mr. Karlovec signed, Exhibit B; is that correct?

[FIORILLI]:  That is correct.

(ECF #16, pp. 51:22-53:19).

_____

[11]

    Hearing Exhibit A is a copy of the *Verified Complaint*.  (*See supra* note, 3).

-17-

### E.  **Welty Construction's Business and Its Employment of Karlovec**

17.  Welty Construction has been in businessfor over 80 years and is a diversified construction business that offers construction management services for its target clients, for which Welty Constuction focuses on developing long-lasting relationships.  (ECF #16, pp. 80:15-23 [Becks]).  Welty Construction is intentionally diverse in its scope, with construction projects in many sectors, including tenant fit-outs, office fit-outs, healthcare, medical, chemical construction, and aviation.  (ECF #16, pp. 80:15-23; 101:22-102:5 [Becks]).

18.  Welty Construction hired Karlovec to work as Director of Client Development within its Welty Select Division to focus on developing and expanding business opportunities with Welty Construction's *current* client base, and not to specifically compete with Fiorilli Construction or to work on projects with Fiorilli Construction customers or proscpects.  (ECF #16, pp. 21:2-4 [Karlovec]; 82:10-84:22 [Becks]).  As Welty President Paul Becks testified, the goal of Welty Select and Karlovec's role is to "deepen [Welty Construction's] relationships with existing clients."  (ECF #16, pp. 82:7-17; 113:6-12 [Becks]).  The primary focus of Karlovec's role appears to be to not necessarily find new clients for Welty Construction, but rather to maintain, nurture, and keep Welty Construction's existing clients to consider Welty Construction for all sized of projects.  (ECF #16, pp. 109:10-112:24 [Becks]).  Although both Welty Construction and Fiorilli Construction work in the general area of "commercial construction," and Karlovec's role at each was/would be "business development" and "sales and marketing for the [respective] company's services," his focus at Welty Construction would be "[a]t a somewhat different capacity" than that at Fiorilli Construction, "with Welty, focusing on the current client base to expand internal opportunities, whereas, with Fiorilli, it was external,

-18-

third-party efforts." (ECF #16, p. 197:15-23 [Karlovec]).

19. According to testimony given at the Hearing, Welty Construction has no intention of competing with Fiorilli Construction for new clients, that it "understood that [Karlovec] couldn't use any Fiorilli Construction confidential information" and would not permit it, and that it "would be an issue" with Welty Construction if Karlovec was focusing on someone else's clients. (ECF #16, pp. 85:5-84:22 [Becks]).

## F. Fiorilli Construction Claimed Confidential Information and Karlovec's Actions

20. *Contacts File*: A key feature in this case is a "Contects File" maintained by Karlovec during his employment with Fiorilli Construction. During his employment with Fiorilli Construction, and as part of his role, Karlovec had access to Fiorilli Construction's "HubSpot CRM" (Client Relationship Management) files. (ECF #16, pp. 161:1-162:4 [Karlovec]). In late January of 2026, Karlovec created from the HubSpot CRM a report of contacts and exported that report to an Excel spreadsheet. (ECF #16, p. 162:8-13 [Karlovec]). Although the information generally available on the HubSpot CRM included information on pricing, project information, and a host of other information, in creating the Excel spreadsheet, Karlovec did not extract any information beyond the names of the contacts, company name, and the contact information located within the HubSpot CRM, *i.e.*, the pricing information, project information, and other items related to "prospect" information was not included. (ECF #16, pp. 161:3-163:2; 164:10-14 [Karlovec]). At the Hearing, Karlovec testified that the reason for his doing so was to identify the contacts among those listed who were persons he knew prior to his employment with Fiorilli Construction, and not for the purpose of disclosing the contacts to anyone or to compete with Fiorilli Construction. (ECF #16, pp. 162:8-164:14; 187:15-21

-19-

[Karlovec]).

21. *Location of Contacts File*:  Karlovec testified that he downloaded the Contacts File while he was still employed by Fiorilli, first, to his Fiorilli-issued computer, then he uploaded to his personal Dropbox account, so he could access it on his personal computer.  (ECF #16, p. 164:15-23 [Karlovec]).  As Karlovec testified – and later verified in testimony given by Caleb Reynolds, Defendants' forensic expert from Interhack Corporation ("Reynolds") – the only locations where the Contacts File existed while in Karlovec's possession was on his Dropbox account and in his personal computer.  (ECF #16, pp. 127:16-21 [Reynolds]; 166:1-4 [Karlovec]; Hearing Exh. G [Reynolds Declaration], Attachment B, Section 1, *Report of At Issue Contacts File: Identification of the At-Issue File*).  In his testimony at the Hearing, Reynolds confirmed that the Contacts File was not moved via external drive or to any other location by tracing the Contacts File across the Dropbox account and the Lenovo computer, reviewing browser history, internal file metadata, and Windows jump-list artifacts.  (ECF #16, pp. 127:16-130:12 [Reynolds]; *see also* Hearing Exh. G, Attachment B, Section 3, *Report of At Issue Contacts File: Elimination of Other Possible Locations*).  During his examination of the Dropbox application data, Reynolds did not observe the Contacts File in the "shared folders" database, and "observed nothing that would suggest" the file had been shared with anyone before Interhack took control of the account.  (ECF #16, pp. 144:22–145:18 [Reynolds]).  Reynolds also testified that, from an evidentiary standpoint, he could determine that the Dropbox folder containing the Contact File "was not shared."  (ECF #16, pp. 145:6–146:21 [Reynolds]).

22. *File Activities for Contacts File*:  Reynolds verified that the Contacts File was

created on January 26, 2026, later modified and uploaded to Dropbox that same day, downloaded from Dropbox onto Karlovec's personal Lenovo computer on January 31, 2026, and modified again on February 2, 2026, all before Karlovec's employment ended.  (ECF #16, pp. 127:4-128:22 [Reynolds]; Hearing Exh. G, Attachment B, Section 2, *Report of At Issue Contacts File: File Activity of At-Issue File*).  Reynolds also verified that, when comparing the initial download from January 26, 2026 to the later desktop version, the later version included an additional column labeled "knew prior to FCI".  (ECF #16, pp. 162:8–25 [Karlovec]; 129:1–18 [Reynolds]; Hearing Exh. G, Attachment B, Section 2).  These facts are consistent with Karlovec's stated intent to download the Contacts Report for purposes of identifying his own prior contacts.

23.  As verified by Reynolds, there is no evidence that Karlovec ever opened the Contacts File after he left Fiorilli Construction on February 10, 2026, or that he used, accessed, or disclosed the Contacts File – or used, accessed, or disclosed any information from the Contacts File or any confidential Fiorilli Construction customer or prospect information to Welty Construction or to anyone else.  (ECF #16, pp. 171:1-10; 175:6-11 [Karlovec]; 86:18-87:15 [Becks]).

24.  *Karlovec's Personal DropBox Account*:  During his employment at Fiorilli Construction, it was well-known at that Karlovec had, and used, a personal Dropbox account to share information internally among Fiorilli Construction personnel for Fiorilli Construction business purposes over the course of all of his nine years at Fiorilli Construction.  (ECF #16, pp. 164:24-166:4 [Karlovec]).  Fiorilli Construction knew that Karlovec used his own Dropbox "to get documents from one device to another to then disseminate throughout the company," such as

-21-

upload photos, notes, and other project information from pre-bid site visits. (ECF #16, pp. 24:16–25:4; 164:15–165:19 [Karlovec]).

25. While Fiorilli Construction now asserts concerns with Karlovec's possession of Fiorilli Construction information in his personal Dropbox account, including a folder titled "Ed Paradise,"[12] the evidence confirms that Karlovec's possession of this information in his Dropbox account was incidental to, and for purposes of, his work with Fiorilli Construction and that there is no evidence that Karlovec improperly took information, or that he used or disclosed any Fiorilli Construction information in the Dropbox or otherwise. (ECF #16, pp. 164:1-14 [Karlovec]; 55:16-57:3 [Fiorilli]). The evidence presented at the Hearing shows that, prior to starting any employment with Welty Construction, any identifiable Fiorilli Construction information held in Karlovec's personal Dropbox was permanently deleted. (ECF #16, pp. 173:1-22 [Karlovec]; Hearing Exh. G, Attachment Ex. C, *Review and Remediation Report*).

26. *Efforts to Remove Fiorilli Construction Information from Karlovec's Possession*: Interhack also collected and preserved Karlovec's devices and accounts beginning Monday, February 23, 2026. (ECF #16, pp. 120:24-121:3; 123:2–5 [Reynolds]; Hearing Exh. G, Attachment C, *Review and Remediation Report*). Reynolds collected and preserved Karlovec's personal devices, including his Samsung Galaxy phone, Samsung Galaxy tablet, Lenovo Yoga computer, and Plaud AI notetaking device, as well as Karlovec's personal accounts, including

---

12

     Other than identifying the fact that a former Fiorilli Construction employee, Ed Paradise, who left Fiorilli Construction over four years ago, presently works for Welty Construction, Fiorilli Construction has presented no evidence that these files – which dated from 2017 and 2018 – have been accessed, shared, or disclosed to anyone since 2018. (ECF #16, pp. 37:10-38:5 [Fiorilli]; Hearing Exh. 7 [List of Dropbox "Ed Paradise Folder/Reports"]; 92:12-25 [Becks]).

-22-

the Samsung cloud connected to his phone and tablet, Dropbox, Google, Plaud cloud, and his OneDrive account connected to the laptop. (ECF #16, pp. 123:8-124:10 [Reynolds]). Reynolds first cataloged the devices and accounts, then ensured the accounts were no longer connected to the devices and changed the passwords so that only Interhack personnel knew them and the passwords were not shared with Karlovec. (ECF #16, pp. 124:2-13 [Reynolds]). Reynolds then imaged, by conducting full file-system extractions of the phone and tablet and a raw forensic image of the Lenovo computer, which he described as a bit-for-bit copy of the internal hard drive. (ECF #16, pp. 124:14-125:9 [Reynolds]).

27. In addition to preservation and identification, Reynolds undertook several remediation measures to remove identifiable Fiorilli Construction information: (a) permanently deleted the Contacts File and copies from the Lenovo computer and Dropbox account and then factory reset the personal computer to make sure all deleted content was removed (ECF #16, pp. 135:14-136:3 [Reynolds]); (b) permanently deleted all contacts from all devices and accounts; (c) permanently deleted all contacts, notes, recordings, call history, texts, additional photos, and documents from Karlovec's personal cell phone (ECF #16, pp. 131:24-132:21 [Reynolds]); (d) factory reset Karlovec's personal cell phone (ECF #16, pp. 132:16-21 [Reynolds]); (e) factory reset the Galaxy tablet (ECF #16, pp. 134:19-24 [Reynolds]); (f) factory reset the Plaud device and permanently deleted all contents in the Plaud account (ECF #16, pp. 126:3-23; 136:7-12 [Reynolds]); (g) permanently deleted the Samsung cloud account altogether and created a new Samsung account, and ensured that Karlovec no longer had access to the old Samsung account (ECF #16, pp. 136:14-137:6 [Reynolds]); (h) permanently deleted the Contacts File and other identifiable Fiorilli information in the Dropbox account (ECF #16, pp.

-23-

137:6-23; 143:21-144:9 [Reynolds]; Hearing Exh. G, Attachment Ex. C, *Review and Remediation Report*); and (i) permanently deleted backups and all contacts in Karlovec's personal Gmail account. (ECF #16, pp. 138:13-139:9 [Reynolds]).  When Reynolds permanently deleted information, the deleted data could not be restored.  (ECF #16, pp. 148:11–17 [Reynolds]).  A full description of the preservation, review, and remediation efforts undertaken by Interhack is described in Hearing Exh. G, Attachment Ex. C, *Review and Remediation Report*).

28.  For all of Karlovec's cloud-based accounts (DropBox, Samsung, Gmail and Plaud), Reynolds changed the passwords such that only Interhack had access to the accounts.  (ECF #16, pp. 124:2-13; 145:1-9 [Reynolds]; Hearing Exh. G, Attachment Ex. C, *Review and Remediation Report*).  Reynolds searched for Fiorilli Construction content across all of the accounts while maintaining control over them.  (ECF #16, pp. 148:4–10 [Reynolds]).  Reynolds verified that, as of the hearing, Karlovec still did not have access to any of these personal accounts.  (ECF #16, pp. 148:4-10 [Reynolds]).  This is because Reynolds also ran the search terms Fiorilli Construction provided across the data sources.  (ECF #16, pp. 136:4; 137:7-10 [Reynolds]; Hearing Exh. G, Attachment Ex. C, *Review and Remediation Report*).  To date, Fiorilli Construction has not identified any additional Fiorilli Construction information that requires further remediation.  (ECF #16, pp. 59:22-60:1 [Fiorilli]).

29.  *No Evidence of Violations*:  Fiorilli Construction admitted that, as of the hearing, it had *no evidence* that Karlovec violated Paragraph 4(b) by employing or seeking to employ anyone from Fiorilli Construction (ECF #16, p. 47:7-18 [Fiorilli]); *no evidence* that Karlovec violated Paragraph 4(c) by encouraging any employee to leave Fiorilli Construction (ECF #16,

-24-

p. 47:16-22 [Fiorilli]); *no evidence* that Karlovec violated Paragraph 4(e) by owning or having any ownership interest "in any business that offers commercial general contracting services that are similar to or the same as Fiorilli, which does business or is located within a 180-mile radius of Medina, Ohio" (ECF #16, p. 49:10-20 [Fiorilli]); *no evidence* that Karlovec "solicited, or attempted to solicit, any Fiorilli Construction customer or prospect" in violation of Paragraph 4(f) (ECF #16, pp. 50:25–51:3 [Fiorilli]); and *no evidence* that Karlovec "disclosed or used the HubSpot report for any purpose, other than what he stated in his declaration already" (ECF #16, p. 55:16–21 [Fiorilli]).[13]  When asked what provision of the Agreement that Karlovec violated by accepting employment with Welty Construction, Fiorilli Construction admitted that Karlovec did not violate the Agreement related to that subject.  (ECF #16, p. 54:11-21 [Fiorilli]).

30.  When asked about the "at-issue" downloaded Contacts File, Fiorilli Construction owner Carmen Fiorilli conceded that "from what I saw, it was just contact names and information" (ECF #16, p. 56:18–24 [Fiorilli]).  Fiorilli Construction further admits that there is no evidence of Karlovec's use or disclosure of the Contacts File or the information within it. (ECF #16, p. 55:16-20 [Fiorilli]).

31.  The evidence confirms that Karlovec (and Welty Construction) engaged in reasonable efforts to ensure that Karlovec did not possess, use, or disclose any Fiorilli Construction information (confidential or not), and thus no evidence of actual violation of the Agreement was shown.  (ECF #16, p. 173:1-22 [Karlovec]; see also generally Hearing Exh. G, Attachments A, B & C).  Karlovec (and Welty Construction) did, and intend to continue to,

---

[13]  Paragraph 4(g), prohibiting Karlovac from accepting employment with a Fiorilli Construction current, past, or prospective client, is not at issue.

honor the reasonable restrictions within the Agreement. (ECF #16, p. 82:7-17, 84:10-86:17 [Becks]; 175:12-22 [Karlovec]). In fact, the evidence produced at the hearing showed that upon receiving information from two Fiorilli Construction customers after he left Fiorilli Construction, Karlovec forwarded the messages and information back to Fiorilli Construction through Fiorilli and Longstreth. (ECF #16, pp. 174:16-175:5 [Karlovec]; 51:4-12 [Fiorilli]). Welty Construction and Karlovec likewise agreed to delay the start date of Karlovec's employment to facilitate confirmation that he did not have any Fiorilli Construction information in his possession. (ECF #16, pp. 171:21-172:5 [Karlovec]; 86:3-17 [Becks]).

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

1. An "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Perry v. May*, 2023 U.S. Dist. LEXIS 12993, *11 (N.D. Ohio Jan. 25, 2023) (citing *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008)). Fiorilli Construction, as the moving party, "bears the heavy burden of demonstrating its entitlement to injunctive relief." *Total Quality Logistics, LLC v. Traffic Tech, Inc.*, 2021 U.S. Dist. LEXIS 234618, at *6 (S.D. Ohio Dec. 8, 2021). Fiorilli Construction must demonstrate: (1) a substantial likelihood of success on the merits; (2) that Fiorilli Construction would suffer irreparable injury without the injunction; (3) the injunction would not cause substantial harm to others; and (4) the public interest would be served by the injunction. *Perry*, 2023 U.S. Dist. LEXIS 12993 at *11-12 (citing *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689-90 (6th Cir. 2014)).

-26-

2. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Oviedo v. Rivera*, 2023 U.S. Dist. LEXIS 40358, at *7 (S.D. Ohio Mar. 9, 2023) (quoting *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)) (superseded by statute on other grounds).

**B.  No Substantial Likelihood of Success on the Merits of Breach of Contract Claim**

3. Plaintiff Fiorilli Construction alleges that Karlovec breached the Agreement pertaining to confidentiality and non-competition.  (ECF #1, *Verified Complaint*, ¶¶ 52-59).  For the reasons detailed below, the Court finds that Fiorilli Construction has not met its burden to establish a substantial likelihood of success on the merits of its breach of contract claim, and that this factor does not support Fiorilli Construction's request for injunctive relief.

**1.  *The Non-Competition Provision as Alleged by Fiorilli Construction***

4. A party seeking to enforce an agreement, and particularly one seeking immediate injunctive relief to enforce the terms of that agreement, must look to the *actual terms* of that agreement.  The Court notes that Fiorilli Construction's *Proposed Findings of Fact and Conclusions of Law Including Proposed Judgment Entry for Preliminary Injunction* (ECF #17) nowhere cites to the *actual language* used in the Agreement.  In reviewing the pleadings and other documents submitted in this case, and evaluating the testimony and documents presented at the Hearing, it is evident that Fiorilli Construction seeks to enforce restrictions that do not exist in the actual Agreement.  Rather, Fiorilli Construction now asks the Court to modify Paragraph 4(d) of the Agreement to restrict Karlovec from "directly or indirectly selling, offering to sell, *or participating in the sale of commercial construction services within 180-mile radius of Medina, Ohio*," (ECF #17, at ¶ 17, p. 13), to effectively prohibit Karlovec from

-27-

participating the sale of *any commercial construction services*, within a *180-mile geographic area*, despite the fact that neither of these restrictions appear in the actual language of Paragraph 4(d) of the Agreement, and that neither can be reasonably inferred from the provisions of Paragraph 4 generally. For the reasons set forth below, the Court finds that the Agreement does not contain the restrictions that Fiorilli Construction seeks to impose, and modification of the Agreement's language to fit Fiorilli Construction's request is not warranted or appropriate under the circumstances.

5. The language in Paragraph 4 of Agreement must be strictly construed as written. *Szokan v. Szokan*, 2020 Ohio App. LEXIS 4845, at ¶ 36 (Ohio Ct. App., 11th Dist., Dec. 31, 2020) ("The cardinal principle in contract interpretation is to give effect to the intent of the parties. Such intent is presumed to reside in the language the parties chose to employ in the agreement.") (internal citation omitted). As actually written, Paragraph 4(d) of the Agreement, which Fiorilli Construction asserts Karlovec violated and that it seeks to enforce, prohibits Karlovec for a period of eighteen (18) months from "Sell[ing], or offer[ing] to sell, services which are offered for sale by the Company." Paragraph 4 contains discrete and independent subparts, *i.e.*, 4(a), (b), (c), (d), (e), (f) and (g), and only one of those subparts, Paragraph *4(e)*, contains a "180-mile" geographic restriction and a reference to "commercial general contracting services," and this subpart deals with Karlovec's potential *ownership* of a construction business entity, not employment with one. (*See* Hearing Exh. 1; Hearing Exh. B) . The fact that Fiorilli Construction took care to separate the language in Paragraph 4(e) to be the only subpart to include a 180-mile geographic restriction and reference to commercial general contracting services confirms the intent to restrict Karlovec's *ownership* of a company that engages in

-28-

commercial general contracting services within 180-mile radius of Medina, Ohio. Under ordinary rules of contract construction, that choice matters. *See Bank One,N.A. v. Pic Photo Finish, Inc*, 2006 Ohio App. LEXIS 5295, ¶ 23 (Ohio Ct. App., 2nd Dist., Oct. 6, 2006) (applying the principle that the expression of one thing implies the exclusion of another). The fact that Fiorilli Construction included a 180-mile geographic restriction and a reference to commercial general contracting services only in Paragraph 4(e), while omitting that language from Paragraph 4(d), supports a finding that the parties did not agree or intend to impose those defined restrictions in Paragraph 4(d) or any of the other subparts.

6. As written and strictly construed against the drafter, in this case Fiorilli Construction, Paragraph 4(d) cannot be construed to include a "180-mile radius" or a prohibition on participating in the sale of apparently *any* "commercial construction services" – restrictions that Fiorilli Construction now asks this Court to impose. *See Cent. Realty Co. v. Clutter*, 62 Ohio St.2d 411, 413, 406 N.E.2d 515, 517 (1980) (ambiguities in a contract are to be resolved against the drafter); *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 363, 678 N.E.2d 519, 527 (1997) (recognizing that courts must "attempt to give effect to each and every part of [the contract]…and avoid any interpretation of one part which will annul another part") (internal citations omitted).

7. Further indication that the parties did not intend for this restriction is Fiorilli Construction's after-the-fact attempt to gain Karlovec's "acknowledgement" of a breach based on the altered language Fiorilli Construction now seeks to impose. Specifically, on February 10, 2026, during his termination, Fiorilli Construction presented Karlovec with a letter that appeared to intentionally misrepresent the actual contractual language of the Agreement relating

-29-

to a "180-mile radius," along with a direction that he sign off on the modified language:

> This employment [with Welty Construction] constitutes a direct violation including, but not limited to Section 4(d) of the Agreement, which expressly prohibits you, for eighteen (18) months following termination from "[s]elling, or offering to sell services which are offered for sale by the Company" within 180-mile radius of Medina, Ohio.
>
> * * * * *
>
> You are hereby directed to: . . . (2) Confirm in writing, no later than 72 hours from receipt of this letter, that you have ceased such activities[.]

(Hearing Exh. D, *Violation Letter*).  More recently, through this request for an injunction, Fiorilli Construction has sought to add the additional restriction to Paragraph 4(d) that it prevent Karlovec from "participating in the sale" of *any* "commercial construction services" within this "180-mile radius of Medina, Ohio" first grafted onto Paragraph 4(d) in the letter.  (*See, e.g.*, ECF #17, *Proposed Judgment Entry for Preliminary Injunction*, ¶ 17, p. 13).

8.  As Fiorilli Construction admitted at the Hearing, the Agreement does not contain the word "non-competition" and nothing in the Agreement prohibits Karlovec from working for a competitor within 180-mile radius or from engaging in commercial construction services within 180-mile radius of Medina, Ohio.  (*See Finding of Fact*, ¶ 16, *supra*, reproducing the Hearing Testimony from ECF #16, pp. 51:22-52:6, 53:14-16 [Fiorilli]). The language of the Agreement stands for itself – Paragraph 4(d) does not specifically restrict Karlovec from "selling or offering to sell commercial construction services" within a "180-mile radius of Medina, Ohio." Paragraph 4(d) restricts Karlovec from "Sell[ing] or offer[ing] to sell, services which are offered for sale by [Fiorilli Construction]" (which the testimony indicated was smaller-scope construction work) over an undefined (and perhaps unlimited, if the language is taken to its outermost extreme) geographic area.  (Hearing Exh. 1; Hearing Exh. B).

9. The specific language of Paragraph 4(d) of the Agreement, as written, may in fact impose restrictions that extend beyond what is reasonably necessary to protect any legitimate business interest of Fiorilli Construction. The specific language of Paragraph 4(d) could be taken to overbroadly restrict Karlovec's ability to work *anywhere in the world*, and the undefined term "services offered for sale by the Company" [Fiorilli Construction] could be taken to unreasonably attempt to restrict Karlovec from working in *any* type of commercial construction if measured against a possibly-changing range of "services offered for sale by the Company." This may have been the impetus for Fiorilli Construction to now seek to add the "180-mile radius" language to Paragraph 4(d), where it does not presently exist.

10. In assessing the validity of a non-compete, the Ohio Supreme Court states that "each case must be decided on its own facts." *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975). Courts consider the following factors to determine the reasonableness of a non-competition covenant: (1) whether the covenant imposes temporal and spatial limitations; (2) whether the employee had contact with customers; (3) whether the employee possess confidential information or trade secrets; (4) whether covenant bars only unfair competition; (5) whether the covenant stifles the employee's inherent skill and experience; (6) whether the benefit to the employer is disproportionate to the employee's detriment; (7) whether the covenant destroys the employee's sole means of support; (8) whether the employee's talent was developed during the employment; and (9) whether the forbidden employment is merely incidental to the main employment. *Raimonde*, 325 N.E.2d at 547.

11. Paragraph 4(d) contains no explicit geographic limitation and amounts to a worldwide restriction. (Hearing Exh. 1; Hearing Exh. B). While worldwide restrictive

covenants may be appropriate where the employer's business is likewise global, Fiorilli Construction's operations do not expand past the states of Virginia, Illinois, and Ohio. (ECF #16, pp. 33-34 [Fiorilli]). *Compare CNG Fin. Corp. v. Brichler*, 2021 U.S. Dist. LEXIS 173886, at *15-27 (S.D. Ohio Sept. 14, 2021) (Ohio courts scrutinize unlimited geographic scope and do not uphold worldwide restrictions when there was no justification for the global scope) *with Convergys Corp. v. Wellman*, 2007 U.S. Dist. LEXIS 90729 (S.D. Ohio Nov. 30, 2007) (accepting global restrictive covenant where employers operations were likewise global).

12. In *CNG Financial*, the noncompete agreement was found to be unreasonable and unenforceable because the restriction imposed a one-year ban with no geographic limitation and there was no fact-based justification for its global scope. *CNG Financial*, 2021 U.S. Dist. LEXIS 173886, at *15-16. In balancing the various *Raimonde* factors, the court recognized, among other things, that there was no direct or circumstantial disclosure of confidential information, the alleged confidential business information would not be useful to the new employer, and the court was "not convinced" the two companies were competitors beyond the fact that both operated in the same general lending space. *Id*. at *17-24. The covenant restrained ordinary, not merely unfair, competition because it would bar the employee from taking any job with any subprime or unsecured personal lending company anywhere in the world, regardless of whether he stole customers, used trade secrets, or acted with intent to harm the former employer. *Id*. at *22–24.

13. Similar to the case presented in *CNG Financial*, here, other than showing that Fiorilli Construction and Welty Construction operate in the "commercial construction industry" generally, Fiorilli Construction and Welty Construction are not presently true competitors and

-32-

operate in different target markets and with different clients.[14] (ECF #16, pp. 81:24-82:17 [Becks]). Fiorilli Construction likewise has not shown any use, disclosure, or even ongoing possession of Fiorilli Construction confidential information by Karlovec, or Karlovec's intent to harm Fiorilli Construction. Fiorilli Construction admits that Karlovec has not solicited customers, has not diverted any business from Fiorilli Construction to Welty Construction, and that it does not know if Karlovec removed or used any Fiorilli Construction information. (ECF #16, pp. 46-47, 50-51, 59-60 [Fiorilli]). In fact, the evidence presented indicates that Karlovec and Welty Construction have expressed a commitment to not solicit or interfere with Fiorilli Construction's customers or prospects. (ECF #16, pp 105:1-4 [Becks]; 174:13-175:17 [Karlovec]).

14. Here, the Agreement, if interpreted as Fiorilli Construction now seeks, would restrict even ordinary competition in the broad commercial construction field, and would prevent Karlovec from using his inherent skills and general experience in sales and business development that he has developed since the '90s both inside and outside of the construction industry, even where no confidential information is implicated. (ECF #16, pp. 13:20-24; 152:1-156:18 [Karlovec, describing his background in commercial construction, including that gained prior to employment with Fiorilli Construction]). *See Cleverland Holdings, LLC v. Mahan*, 2023 U.S. Dist. LEXIS 207538, at *25–26 (N.D. Ohio 2023) (finding covenant

---

14

    This case may present a question over whether Welty Construction *might* be considered a "competitor" with respect to small-scale construction projects contemplated by Welty Construction's *own long-time existing clients*, but in neither the pleadings, documents, nor the hearing testimony has Fiorilli Construction identified any such existing *Welty Construction client* that Fiorilli Construction otherwise considers its own which would compel the entry of injunctive relief..

overbroad where it prevented employee from utilizing her general skills and knowledge and effectively restrained her ability to work in her profession). Paragraph 4(d), as written with an unlimited geographic scope, and now interpreted by Fiorilli Construction to prevent Karlovec from "selling or offering to sell" *any* "commercial construction services" would prevent Karlovec from doing client development work in the commercial construction industry *at all*, regardless of where he does it, for whom he does it, or whether any unfair conduct occurs.

15. On these facts, the restrictions sought by Fiorilli Construction would not reasonably protect a legitimate business interest, and instead function as a blanket restraint on Karlovec's ability to continue utilizing his business development experience and skills generally.

16. Modification of Paragraph 4(d) of the Agreement to fit Fiorilli Construction's injunction request is not appropriate. Fiorilli Construction seeks to unilaterally modify Paragraph 4(d) to include a "180-mile" geographic limitation that does not presently exist in the only paragraph of the Agreement at issue (which, alone, *might* be applied to limit the otherwise potential *worldwide* scope), and to *also* interpret the words "which are offered for sale by the Company" to now mean *any* "commercial construction services" (which would clearly *expand* the restrictive provisions of the Agreement to essentially prevent Karlovec from working in commercial construction at all).

17. While the Ohio Supreme Court in *Raimonde* held that a court *may* modify an agreement, it does not *require* the Court to use its discretion to modify the Agreement. *Raimonde*, 42 Ohio St. 2d at 28 ("this court holds, for the first time, that a trial court may enforce a covenant 'to the extent necessary to protect an employer's legitimate interests'") (emphasis added); *Professional Investigations & Consulting Agency, Inc. v. Kingsland*, 69 Ohio

App.3d 753, 760, 591 N.E.2d 1265 (Ohio Ct. App., 10th Dist.,1990); *See also Facility Servs. & Sys., Inc. v. Vaiden*, 2006 Ohio App. LEXIS 2789, at ¶ 54 (Ohio Ct. App., 8th Dist., June 8, 2006) ("the trial court was not mandated to modify the provisions to render them enforceable").

18.  In *Facility Services & Systems, Inc.*, it was not an abuse of discretion to decline modification of the noncompete provision after concluding that the restriction "exceed[ed] what [was] necessary to protect the company's legitimate interest" and imposed "undue hardship on the employee." *Id.* at ¶¶ 53–54.  The provision barred Defendant, for two years after termination, from owning, managing, operating, working for, participating in, or being connected "in any manner" with any business similar to the type of business in which Plaintiff was engaged as of the date of termination. *Id.* ¶¶ 3, 5, 42–43.  The restriction was found to be unreasonable because it had no geographic limitation, it imposed a two-year term, there was no evidence that Defendant disclosed confidential information, the provision restrained ordinary rather than unfair competition, it extended to lines of work that were merely incidental to Plaintiff's principal business during Defendant's employment and to areas where Plaintiff sought contracts but had not yet obtained them, and it restricted Defendant's sole means of support given his skills and long experience in airport-related employment. Id. ¶ 53.

19.  Ohio courts who find a restrictive covenant unenforceable routinely refuse to modify, or simply do not attempt to address modification.  *See, e.g. Geloff v. R.C. Hemm's Glass Shops*, 2021 Ohio App. LEXIS, at ¶ 33 (Ohio Ct. App., 2nd Dist., Feb. 12, 2021) (affirming denial of modification where covenant itself was unenforceable as a matter of law); *Cleverland Holdings, LLC*, 2023 U.S. Dist. LEXIS 207538, at 44 (court did not address modification because plaintiff did not show the covenant was enforceable, a likelihood of success on the

-35-

merits, or irreparable harm).

20.  The interpretation of the Agreement offered by Fiorilli Construction – with "modifications" it would ask this Court to impose – would result in the application of overbroad restrictions, without a compelling legitimate business interest to justify them, based on what appears to be its own broad (and perhaps even contradictory) interpretation of how the restrictions could be applied.  At one point in the Hearing, Fiorilli Construction appears to characterize "architects and engineers" as its "customers or prospects," (*see* ECF #16, p. 31:8-12 [Fiorilli]) ("So [Karlovec] was really the head of all the touch points of all the relationships, whether they be *current customers or prospects*, including people that we look to for referrals for work from, whether it be brokers or *architects, our entire client base*"); at another point in the Hearing, Fiorilli Construction states that Karlovec could work for architectural firms or engineering firms without violating the Agreement, (*see* ECF #16, p. 32:8-21 [Fiorilli]).  Other testimony offered at the Hearing characterized architectural and engineering firms as other "service providers" in the commercial construction field.  (ECF #16, pp. 84:24-85:9 [Becks]).  However, under the Agreement, as Fiorilli Construction now asks the Court to apply it, Karlovec would be explicitly prohibited from such employment by "participating in the sale of commercial construction services" "within an 180-mile radius of Medina, Ohio" risking a perception that he violated Paragraphs 4(d) or 4(f).

21.  While it *may* be warranted for a court to place limited geographic restrictions on an otherwise enforceable, and understandable, limitation on types of work Karlovec clearly agreed to be temporally restricted from, it would *not* be legitimate for the Court to rewrite an overbroad geographic restriction to first limit its geographic reach, only to *expand* the definition of

-36-

restricted work to essentially include the entire commercial construction industry, as Fiorilli Construction's proposed injunction would seek.  Courts do not step in to salvage provisions that are facially overbroad, restrain ordinary competition, and impose disproportionate hardship, particularly where, as here, there has been no evidence offered of misuse of confidential information or intent to harm, and the restriction would operate to bar lawful employment in the industry altogether.

### 2. *Alleged Violation of Confidentiality Restrictions*

22.  There is no disagreement between the parties that the Agreement's confidentiality provision requires Karlovec to maintain in strict confidence all Company information, prohibits disclosure to non-employees, and limits use of such information solely to his duties for the Company.  It further provided that these obligations continued after employment ended, required that Company information not be removed or used outside the Company's business, and required the return of all such information upon termination.  (Hearing Exh. 1, ¶ 3; Hearing Exh. B, ¶ 3).

23.  At the time of his separation, however, Fiorilli Construction issued inconsistent instructions regarding that information. On the one hand, Fiorilli Construction directed Karlovec to delete any Fiorilli Construction information, which Karlovec was and remains prepared to do, (*see* Hearing Exh. D, *Violation Letter*) ("You are hereby directed to: . . . (3) Provide written certification that all [Fiorilli Construction] confidential information and materials have been or will be returned or permanently destroyed, including any CRM data, customer lists, pricing, proposals, or electronic records stored on any device or account under your control"), while, in the same letter "instructed to Preserve and not destroy any and all evidence of any of the above,"

(*id.*), and on that same day, received a cease-and-desist letter from Fiorilli Construction's counsel instructing him to preserve all such information.  (ECF #16, p. 170:2-21; Hearing Exh. D).

24.  The confidentiality and non-public availability of Fiorilli Construction's customer information is also somewhat unclear, as testimony provided at the Hearing established that "customer information" in the commercial construction industry is often publicly and/or readily available through public and purchased marketing resources.  (ECF #16, pp. 87:16-89:9 [Becks]).  In fact, the identity of many of Fiorilli Construction's own customers are publicized through its own website.  (ECF #16, p. 88:4-12 [Becks]).

25.  Even if the Court were to assume the confidentiality of the client contact information at issue,[15] and Fiorilli's reasonable efforts to protect it, there is no evidence that Karlovec used, disclosed, or accessed any Fiorilli confidential information after his employment ended or disclosed anything to Welty Construction or anyone else.  (ECF #16, pp. 86:18-87:15 [Becks]).  As Fiorilli Construction admitted, there is no evidence that Karlovec disclosed or used the HubSpot report, and no evidence that Karlovec solicited or attempted to solicit any Fiorilli customer or prospect.  (ECF #16, pp. 50:25-51:3; 55:16-21 [Fiorilli]).

26.  Further, the evidence produced at the Hearing establishes that Karlovec, via his forensic expert, Interhack, remediated any potential Fiorilli Construction information from all of Karlovec's devices.  (ECF #16, pp. 124:2-125:9; 136:2-6; 145:6-12; 148:5-19 [Reynolds]).

---

[15]

As noted earlier, Fiorilli Construction has conceded that it appears the only information included in the "Karlovec download" at issue is name and basic contact information, and no evidence of pricing information, project information, or other business notes being involved. (*See Findings of Fact*, *supra*, ¶¶ 29-30).

-38-

27. Based on the facts established in the record and at the Hearing, and applying the applicable legal standards, Fiorilli Construction has not shown a substantial likelihood of success on the merits of its "breach of contract" claim.

**C. No Substantial Likelihood of Success on the**
**<u>Merits of the Trade Secret Misappropriation Claims</u>**

28. Fiorilli Construction also alleges misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, and the Ohio Uniform Trade Secrets Act ("OUTSA"), OHIO REV. CODE § 1333.61, *et seq.* The requirements for establishing misappropriation under the two statutes are "substantially the same." *Collar Jobs, LLC v. Stocum*, 2022 U.S. Dist. LEXIS 216078, at *32 (N.D. Ohio Nov. 30, 2022) (internal citation omitted). "[T]he DTSA defines misappropriation as requiring the acquisition or disclosure of an improperly acquired trade secret." *Corp. Lodging Consultants v. Szafarski*, 2021 U.S. Dist. LEXIS 157343, *24-25 (N.D. Ohio 2021). To show misappropriation, Fiorilli Construction must demonstrate: "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; (3) and the unauthorized use of a trade secret." *Id.* at *52 (citing *Handel's Enters., Inc. v. Schulenburg*, 765 F. App'x 117, 122 (6th Cir. 2019)). Only "actual or threatened" misappropriation of trade secrets may be enjoined. *Millennium Health, LLC v. Roberts*, 2020 U.S. Dist. LEXIS 93942, at *52 (N.D. Ohio Mar. 4, 2020).

29. As discussed above, with reference to many construction services company's list of clients (or partial list) being easily found through an internet search, including on their own website, it is not ready established that the Fiorilli Construction's client identity information at issue here (names of customers and contact information) rises to the level of trade secret status, whether it was in fact confidential, and whether Fiorilli Construction took the purported

-39-

"reasonable steps" necessary to protect its trade secrets. *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1300 (11th Cir. 2018) (the information did not qualify for trade secret protection where the employer allowed employees to keep the information on personal devices). Here, testimonial evidence produced at the Hearing indicated that Fiorilli Construction knew that Karlovec used his personal phone for business, knew he used his personal Dropbox to move and share company information internally, and knew he used his personal Plaud device for meetings and sales calls. (ECF #16, pp. 165:14-166:13; 167-168 [Karlovec]; 61:7-21, 63:8-20 [Fiorilli]).

30. Even assuming trade secret status and reasonable protection, downloading or retaining trade secret information while employed, without evidence of unauthorized use, disclosure, or improper purpose, does not constitute misappropriation under the DTSA. *See Glasstech, Inc. v. TGL Tempering Sys., Inc.*, 50 F.Supp.2d 722, 729 (N.D.Ohio 1999) ("Trade secrets are protected only when they are disclosed or used through improper means") (internal citation omitted); *eShares, Inc. v. Talton*, 727 F. Supp. 3d 482, 493-94 (S.D.N.Y. 2024) ("[improper means] requires a level of impropriety that merely accessing or downloading documents onto a personal device does not implicate"); *Apple Inc. v. Rivos, Inc.*, 2023 U.S. Dist. LEXIS 140628, at *22 (N.D. Cal. Aug. 11, 2023) (noting that "allegations that former employees merely possessed or failed to return lawfully acquired information are insufficient by themselves to establish misappropriation or show injury under the DTSA"); *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020) ("[T]he failure to return lawfully acquired information does not constitute 'misappropriation' of that information under the DTSA.") (citing *Prominence Advisors, Inc. v. Dalton*, 2017 U.S. Dist. LEXIS 207617 (N.D.

Ill. Dec. 18, 2017)).

31.  Fiorilli's reliance on *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995),[16] for the proposition that the "inevitable disclosure" doctrine provides an independent basis for irreparable harm is unfounded.  *Id*. at 1270–71 (affirming finding irreparable harm where the district court coupled the demonstrated inevitability that the employee would rely on the former employer's trade secrets in his new job with the district court's supported reluctance to believe the employee's denials, based on findings of lack of candor, "out and out lies," and other circumstances suggesting a willingness to misuse the former employer's trade secrets).[17]  In fact, the decision in *PepsiCo*, refereincing an earlier case – *Teradyne, Inc. v. Clear Comm. Corp.*, 707 F. Supp. 353 (N.D. Ill. 1989) (where plaintiff Teradyne alleged that a competitor, Clear Communications, had lured employees away from Tereadyne and intended to employ them in the same field) – explicitly rejected the proposition on which Fiorilli Construction's claims seem to be based:

> [T]he defendants claimed acts, working for Teradyne, knowing its business, leaving its business, hiring employees from Teradyne and entering the same field (though in a market not yet serviced by Teradyne) do not state a claim of threatened misappropriation.  All that is alleged, at bottom, is that defendants could use plaintiff's trade secrets, and plaintiffs fear they will.  This is not enough.  It may be that little more is needed, but

---

[16]  *See* ECF #17, Plaintiff's Proposed Findings of Fact and Conclusions of Law, ¶ 11, p. 11.

[17]  Plaintiff Fiorilli Construction cites *PepsiCo, Inc.*, as explicitly stating that irreparable harm may be presumed whenever an employee "(1) possesses trade secrets of the former employer; (2) takes a position with a direct competitor; and (3) the new position necessarily requires use of that information."  But *PepsiCo, Inc.*, does not stand for this proposition.  The Seventh Circuit noted that "the mere fact that a person assumed a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose . . . trade secret information' so as to 'demonstrate irreparable injury.'" *PepsiCo, Inc.*, 54 F.3d at 1269.

-41-

falling a little short is still falling short.

*PepsiCo, Inc.*, 54 F.3d at 1258-59 (quoting *Teradyne*, 707 F. Supp. at 357). Without some evidence, or a real sense, of wrongdoing, courts routinely find no evidence of irreparable harm. *A&P Technology, Inc. v. Lariviere*, 2017 U.S. Dist. LEXIS 211822, at *12-13 (S.D.Ohio Dec. 27, 2017) (citing *Polymet Corporation v. Newman et al*, 2016 U.S. Dist. LEXIS 113000 (S.D. Ohio Aug. 24, 2016) (heavy reliance placed on circumstantial evidence of creating his own new competing company, communicating about new competing company, attempted diversion of relationships, and evidence of customer business going to new company). Accordingly, while the inevitable disclosure doctrine can be used to demonstrate a threat warranting preliminary injunction under the OUTSA, there must be some substantive support of a legitimate threat of disclosure in the facts of the case beyond the mere fact that a former employee has agreed to protect confidential information. *A&P Technology, Inc. v. Lariviere*, 2017 U.S. Dist. LEXIS 211822 at *16.

32. The record does not show any unauthorized use, disclosure, or threatened use of any alleged trade secret after Karlovec's employment ended. The evidence shows that the "at-issue" HubSpot Contacts File was created, modified, uploaded, and downloaded while Karlovec was still employed by Fiorilli Construction (thus an act he was objectively entitled to do), and Karlovec testified that he downloaded it to identify contacts he knew before joining Fiorilli Construction, (ECF #16, pp. 162:8-163:25 [Karlovec]; 127:8-128:22 [Reynolds]) – perhaps an action taken with more of a personal motivation than a "Fiorilli Construction business purpose" motivation – but not automatically a sinister one. Fiorilli Construction admitted that, as of the Hearing, there was no evidence that Karlovec disclosed or used the HubSpot report for any

-42-

purpose other than what Karlovec stated, no evidence that Karlovec solicited or attempted to solicit any Fiorilli customer or prospect, and no evidence that Karlovec violated the Agreement merely by accepting employment with Welty Construction. (ECF #16, pp. 50:25-51:3; 54:14-24; 55:16-20 [Fiorilli]).

33. The record likewise does not support a threatened misappropriation theory. Karlovec testified that he never shared the at-issue file with anyone, never disclosed its contents to anyone, never shared his Dropbox password with anyone, and never allowed anyone else to access that Dropbox account. (ECF #16, p. 166:12–25 [Karlovec]). Reynolds's (the Interhack expert) forensic testimony was consistent with that account. There was no indication that the Contacts File was shared or copied to an external storage device. (ECF #16, pp. 127:13–131:12; 144:15–146:7 [Reynolds]). The evidence produced at the Hearing indicated that Welty Construction hired Karlovec to work with Welty Construction's existing client base, not to pursue Fiorilli Construction's customers or prospects, and Welty Construction's President, Paul Becks, testified that Welty Construction would not permit Karlovec to use Fiorilli Construction confidential information or focus on someone else's clients. (ECF #16, pp. 21:2–4 [Karlovec]; 82:10–84:22 [Becks]). Fiorilli Construction may challenge the accuracy of this testimony, but it produced no evidence to contradict it. On this record, Fiorilli Construction's claim rests on possession alone and speculation about what might happen, not evidence of actual or threatened misuse.

34. The remediation evidence produced at the Hearing further defeats any claim that misappropriation is either ongoing or likely. After Karlovec engaged Interhack, Interhack collected and preserved his devices and accounts, changed passwords on those devices so only

-43-

Interhack had access, and permanently deleted the at-issue file and other Fiorilli Construction content either through factory reset or other forensic means. (ECF #16, pp. 123:2–125:7; 135–137; 145; 148 [Reynolds]).

35. Fiorilli Construction therefore has failed to show, on these facts, that any alleged trade secret has been or will be used or disclosed. At most, the evidence shows that Karlovec retained information while still employed, disclosed nothing, used nothing after leaving, and then submitted his devices and accounts to forensic preservation and remediation. That is not enough to establish a substantial likelihood of success on the merits of Fiorilli Construction's trade secret claims.

### D. No Evidence of Irreparable Harm

36. Courts in this District have previously recognized that "additional emphasis will be placed on irreparable harm, given that the purpose of a temporary restraining order is to maintain the status quo." *Oviedo v. Rivera*, 2023 U.S. Dist. LEXIS 40358 (S.D. Ohio Mar. 9, 2023), at *7; *Perry v. May*, 2023 U.S. Dist. LEXIS 12993 (N.D. Ohio Jan. 25, 2023), at *11 ("The purpose of a TRO is to preserve the status quo so that a reasoned resolution of a dispute may be had").

37. Here, Fiorilli Construction presented no evidence of any actual disclosure, no evidence of any use of the HubSpot report beyond what Karlovec explained, no evidence that Karlovec solicited or attempted to solicit any Fiorilli Construction customer or prospect, and no evidence that Welty Construction hired him to pursue Fiorilli Construction business. (ECF #16, pp. 50:25–51:3; 55:16–21 [Fiorilli]; 21:2–4; Becks Tr. 82:10–84:22 [Karlovec]). Karlovec likewise has not shared and no longer has access to any Fiorilli Construction information. (ECF

#16, pp. 127:14–130:25; 144–146; 148 [Reynolds]). On this record, Fiorilli Construction's alleged harm is speculative, and does not support a finding that it is irreparable. *Michigan Coal. of Radioactive Material Users, Inc.*, 945 F.2d 150, 154 (6th Cir. 1991) ("the harm alleged must be both certain and immediate, rather than speculative or theoretical").

38. The purpose of an injunction is to prevent future violations rather than remedy past harms. *U.S. v. W.T. Grant Co.*, 345 U.S. 629 (1953) (citing *Swift & Co. v. U.S.*, 276 U.S. 311, 326 (1928)). While Fiorilli Construction relies on *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992), for the general proposition that "an employer is likely to suffer irreparable harm when an employee breaches a non-competition covenant, resulting in a loss of fair competition,"[18] that case involved materially different facts, including evidence that the employees promptly solicited their former employer's customers after joining a direct competitor. *Id.* at 509.

39. This Court is not obligated to accept Fiorilli Construction's implied assumption that any breach of a non-compete agreement, regardless of reasonableness, always results in loss of fair competition. *CNG Fin. Corp.*, 2021 U.S. Dist. LEXIS 173886 (S.D. Ohio Sept. 14, 2021), at *37 ("The Court cannot accept, however, Axcess's implied assumption that any breach of a non-compete, regardless of reasonableness, always results in a loss of fair competition"). Here, Karlovec's interpretation of his Agreement, that gathering the names of his prior contacts as contained within the Contacts File he had been using for nine years and leaving Fiorilli Construction to work at Welty Construction to service Welty Construction's existing clients,

---

[18] *See* ECF #4, *Plaintiff's Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction*, p. 9.

was reasonable. Moreover, there is no evidence that Karlovec's role with Welty Construction would result in competitive activity.

### E. **Preliminary Injunction Would Compromise Public Interest**

40. Fiorilli Construction states that "to the extent the public has an interest in this matter, it is in 'preserving the sanctity of contractual relations and preventing unfair competition.'" (ECF #4, *Plaintiff's Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction*, p. 11) (citing *Blakeman's Valley Office Equip., Inc. v. Bierdeman*, 786 N.E.2d 914, 920 (Ohio Ct. App. 2003)). However, that principle does not support Fiorilli Construction as this case now stands. Preserving the sanctity of contractual relations requires enforcing the contract as written, not permitting a party to unilaterally modify its restrictions after the fact. *See Willis v. Avery Label Sys.*, 1996 Ohio App. LEXIS 1057 (Ohio Ct. App., 8th Dist., Mar. 21, 1996), at *5. Fiorilli Construction's now-offered interpretation of Paragraph 4(d) the Agreement (to, in-hindsight, limit its written worldwide reach to a 180-mile geographic area, but to *expand* its scope to prevent Karlovec from "selling or offering to sell" *any* "commercial construction services" within that area) does not advance the public interest in enforcing valid contracts. It likewise contradicts the well-settled principle of contract construction that ambiguities are construed against the drafter – in this case Fiorilli Construction. *See Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216 (2003), ¶ 13.

41. Because Fiorilli Construction is not facing immediate and irreparable harm, there is no need to grant extraordinary relief. *United HealthCare Servs., Inc. v. Corzine*, 2021 WL 961217, at *19 (S.D. Ohio Mar. 15, 2021). As outlined throughout the above discussion: (1) the restrictions Fiorilli Construction now asks this Court to impose are not those contained in

the *actual language* of the Agreement, particularly that of Paragraph 4(d), which is the only term of that Agreement specifically at issue; (2) the potentially worldwide geographic limitation contained in the actual language of Paragraph 4(d) of the Agreement would render it unenforceable, and such would not protect a legitimate business interest; (3) court modification of the Agreement (which *may* be done under the direction of *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975)) *might* perhaps warrant placing a more limited geographic limitation on an otherwise reasonable restriction contained in the *actual language* of the Agreement (though a court is not required to do so), but such modification is clearly not warranted to *expand* the restrictions contained in the actual language of the Agreement to prohibit engagement in *any and all* commercial construction services, when no such language appears in the at-issue term of the Agreement; and (4) there has been no evidence presented of actual breach of the Agreement or harm.  The public interest would not be served by "enforcing" the Agreement Fiorilli Construction asks this Court to impose, particularly when the offered interpretation is not supported by the language of the Agreement.  Courts have recognized that the public interest in "enforcing questionable non-compete agreements" may readily be outweighed by other considerations.  *See Am. Sys. Consulting v. Devier*, 2007 U.S. Dist. LEXIS 66339, at *11 (S.D. Ohio Sept. 7, 2007).  Courts have further held that where a plaintiff "has not submitted enough evidence to establish a 'substantial likelihood'" of success, "whether a preliminary injunction serves the[]public interest[] is also too speculative to justify such extraordinary relief." *Total Quality Logistics, LLC v. EDA Logistics*, 2021 U.S. Dist. LEXIS 92843, at *27 (S.D. Ohio May 17, 2021).

42. That is precisely the situation here.  Fiorilli Construction has not shown that

-47-

Karlovec used or disclosed any confidential information or that he is working in competition with Fiorilli Construction. The public interest is not served by enjoining lawful employment based on unsupported allegations. *See Transtar Industries, LLC v. Lester*, 2019 U.S. Dist. LEXIS 128001, at *22 (N.D. Ohio July 31, 2019) (finding the public interest would not be served by injunctive relief where plaintiff failed to demonstrate use of confidential information). Because Fiorilli Construction's claims rest on speculative allegations about alleged use of confidential information, the public interest weighs against injunctive relief.

### F. Attorney Fees are Not Warranted

43. Paragraph 5 of the Agreement provides that, if Karlovec violated the Agreement, Fiorilli Construction would be entitled to an injunction and to recover its costs, including attorneys' fees, incurred in enforcing the Agreement. (Hearing Exh. 1; Hearing Exh. B, ¶ 5].

44. Fiorilli Construction did not prove any violations here. Fiorilli Construction admitted it has no evidence that Karlovec solicited or attempted to solicit any Fiorilli Construction customer or prospect, produced no evidence that Karlovec disclosed or used the HubSpot report for any purpose other than what Karlovec stated, and admitted that Karlovec did not violate the Agreement merely by accepting employment with Welty Construction. (ECF #16, pp. 50:25–51:3; 54:14-55:20 [Fiorilli]). The forensic evidence produced at the Hearing likewise showed no disclosure of the at-issue file, no evidence it was copied to an external storage device, and no ongoing access by Karlovec. (ECF #16, pp. 127:13–131:12; 144-146; 148 [Reynolds]). Given these facts, there has been no violation established, and no "breach" to enforce under the actual terms of the Agreement. Fees are not warranted under the Provisions of Paragraph 5 of the Agreement.

-48-

45. The circumstances of this case support a finding that Fiorilli Construction filed and pursued this action prematurely, based primarily on speculation and without any actual threat of irreparable harm, seeking a modification of its Agreement to expand its terms to essentially prohibit Karlovec from engagement in *any and all* commercial construction services (as even its claim that Karlovec could work for architectural firms, engineering firms, or specialty contractors would, under the relief Fiorilli Construction seeks, "violate" the Agreement). Fiorilli Construction's claimed harm appears based on unsupported assumptions about what Karlovec "might do," even though the record showed no post-employment use, disclosure, solicitation, or diversion, and "future use" of any "downloaded information" (even if the name and contact information at issue were to be considered "trade secret"), and all such information has been remediated and removed from Karlovec's devices and accounts (though preserved by Interhack in the event there is a future need for it in this case). Such actions do not support fee recovery under the Agreement.

## IV. CONCLUSION

Based on the foregoing *Findings of Fact and Conclusions of Law*, the Court denies Plaintiff Fiorilli Construction Company, Inc.'s *Motion for Temporary Restraining Order and Preliminary Injunction* (ECF #3). Specifically, the Court finds that Fiorilli Construction has not demonstrated a substantial likelihood of success on the merits of its claims for breach of contract or trade secret misappropriation, has not demonstrated irreparable harm, and the public interest would not be advanced if the Court were to "enforce" terms that go beyond the *actual* terms of Paragraph 4(d) of the Agreement, as now sought by Fiorilli Construction.

The case may, of course, proceed in the normal scope of litigation if Fiorilli

-49-

Construction believes it has incurred actual money damages (which are not a factor decided on a motion for injunctive relief) based on the facts as established and presented by this case, pursuant to the *actual* Agreement entered into between Karlovec and Fiorilli Construction.

IT IS SO ORDERED.

_____
DONALD C. NUGENT
United States District Judge

DATED: _____